## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

BRUCE PARKER #593090,

     *Plaintiff*,

*v.*

JEFFERY NORMINGTON,
ROBERT SCHILLER, JAMES
BERRY, and RICHARD CADY;

     *Defendants*.[1]

_____/

CASE NO. 2:13-CV-13670

DISTRICT JUDGE NANCY G. EDMUNDS
MAGISTRATE JUDGE PATRICIA T. MORRIS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(Doc. 19)

### I.    RECOMMENDATION

For the reasons presented below, **IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment be **GRANTED**.

### II.    REPORT

#### A.    Introduction

Plaintiff Bruce Parker filed this *pro se* prisoner civil rights action under 42 U.S.C. § 1983 on August 27, 2013 against Defendants Jeffery Normington, Robert Schiller, James Berry, and Richard Cady. Plaintiff alleges (1) Eighth Amendment violations by Defendant Normington for allegedly groping Plaintiff's genitalia, and by Schiller and Berry for allegedly "taunting" Plaintiff by ordering him to bend over repeatedly while he was being strip searched, (Doc. 1 at 12.); (2) an access to courts violation by Defendant Cady for allegedly destroying legal mail, (Doc. 1 at 12.); and (3) First Amendment violations from Defendants Normington, Schiller, Berry, and Cady for

---

[1] Defendants Ryan and Scutt were terminated from case on September 12, 2013.

allegedly retaliating against Plaintiff for filing a complaint in federal court and for filing grievances through Michigan Department of Corrections ("MDOC"). (Doc. 1 at 13-14.); *see also* Complaint at 1, *Parker v. Haase*, No 2:12-CV-14321 (E.D. Mich. Oct. 23, 2012).

Defendants move for summary judgment, offering arguments for each of the Plaintiff's claims as follows. For the Eighth Amendment claims, Defendants Schiller and Berry argue that "[a]llegations of verbal harassment by prison officials toward an inmate do not constitute punishment" for Eighth Amendment purposes. (Doc. 19 at 10.) Defendant Normington argues that "a single incident of touching" does not rise to the level of "severe or repetitive sexual abuse" necessary to properly plead an Eighth Amendment violation. (*Id.*) For the access to courts claim, Defendant Cady argues that Plaintiff fails to "show that he suffered 'actual injury,'" which cannot be "satisfied by just any type of frustrated legal claim," but "must be connected to pursuit of a non-frivolous direct appeal from a criminal conviction, a habeas corpus petition or a civil rights action under 42 U.S.C. § 1983 . . . ." (Doc. 19 at 12-13.) (Quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 391 (6th Cir. 1999) (en banc)). For the retaliation claims, Defendants argue that Plaintiff fails to show that the "adverse action was motivated, at least in part by [Plaintiff's] protected conduct," and that the adverse action would not "deter a person of ordinary firmness from continuing to engage in that conduct." (Doc. 19 at 14-21.) Defendants also assert they are entitled to qualified immunity. (Doc. 19 at 21-24.)

Because Plaintiff fails to allege facts sufficient to show any of his constitutional rights have been violated, I suggest that Defendants Motion for Summary Judgment be **GRANTED**.

### B.    Standard of Review

A motion for summary judgment will be granted under Rule 56 of the Federal Rules of Civil Procedure when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All facts and inferences must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has "'the initial burden of showing the absence of a genuine issue of material fact' as to an essential element of the non-movant's case." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Celotex Corp. v Catrett*, 477 U.S. 317, 323 (1986)). In determining whether the moving party has met its considerable burden, a court may consider the plausibility of the moving party's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper where the moving party shows that the non-moving party is unable to meet its burden of proof. *Celotex*, 477 U.S. at 325.

In response, the non-moving party cannot rest merely on the pleadings. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Instead, the nonmoving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). When the nonmoving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479-80. Instead, the court will rely upon the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992).

After examining the evidence designated by the parties, the court then determines "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so

3

one-sided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

### C.    Relevant Background

### 1.    Shake Down, Strip Search, and Issuance of Misconduct Tickets

Plaintiff allegedly went to the G. Robert Cotton Correctional Facility ("JCF") Healthcare Department on October 24, 2012 for an update "on three grievances that he had written concerning healthcare's lack of treatment, which was the reason plaintiff filed a civil suit on 10/1/2012," *see Parker v. Haase*, No 2:12-CV-14321 (E.D. Mich. Oct. 23, 2012). (Doc. 1 at 4.) At this time, he says he had a "heated discussion with the reviewing [n]urse M. Wilson and the conversation was overheard by . . . [Defendant] Normington who was the officer that was assigned to work in healthcare" that day. (*Id.*) Plaintiff says he returned to work after his visit to healthcare and that he left work around 1:52pm. (*Id.*)

According to Plaintiff, Defendant Normington approached him at 1:55pm and ordered multiple 'pat down' searches. (*Id.*) He claims to have complied with the first two pat downs, but on the third Normington "groped Plaintiff's testicles and penis." (*Id.*) Plaintiff alleges that while Normington was "holding [P]laintiff's testicles and penis [Normington] asked 'what is this?'" (*Id.*) Plaintiff claims that he responded "'this is my private area and you shouldn't be touching me like this.'" (*Id.*) Normington allegedly responded "'I hate when criminals come to prison and then file frivolous lawsuits when they don't get their way, you guys never think about this when you [are] out the[re] in the streets committing crimes.'" (*Id.*) When asked for another pat down, in response

4

to this alleged groping, Plaintiff claims that he asked for a sergeant's presence "due to him being sexually assaulted." (*Id.*) Plaintiff also states that he "was written a disobeying a direct order ticket in response to [P]laintiff not allowing C/O J. Normington to continue his sexual assault on [P]laintiff . . . [and] asking for a sergeant[']s presence." (*Id.* at 9.)

From Defendant Normington's perspective, Plaintiff requested that a sergeant be present when he was asked for a second pat down: "I requested [that Plaintiff comply with] a second pat down search, but [he] became agitated and accused me of touching him [in]appropriately. When I repeated my request, Parker again refused and stated he wanted to see the sergeant." (Doc. 19-3 at 2.)

After the pat down(s), Plaintiff estimates that Sergeant Schiller arrived on the scene around 2:00pm to investigate. (Doc. 1 at 6). Plaintiff says that he "explained the situation and how he had just been [s]exually [a]ssaulted," and that "Sgt. Schiller stated that officers could do whatever they w[a]nted to do and that he was going to take me to the hole to be strip searched." (*Id.*) Plaintiff states that he was then "taken to the hole . . . by Sgt. Schiller and strip[] searched by C/O Berry with Sgt. Schiller supervising." (*Id.*) Plaintiff asserts that Defendants Berry and Schiller taunted him, (*Id.* at 12), while forcing him to "continue to bend over while naked." (Doc. 20 at 24.)

Plaintiff asserts that Defendant Schiller went to Plaintiff's room, took six pair of underwear that Plaintiff had purchased the day before, and planted the underwear in an empty cell in the 'hole.' (Doc. 1 at 5-6.) Plaintiff maintains that Defendants relocated him to this cell after they had strip searched him in a different cell and found no stolen items: "after the strip search was completed and he had found no contraband . . . Plaintiff was placed in a cell that had clothes on the floor." (*Id.*) Plaintiff claims that Defendant Berry's response when Plaintiff told him about the

5

clothes was, "[y]ou w[a]nt to see set up? I'll show you set up." (*Id.*) Plaintiff says that once he was placed in the cell he asked Berry "was he really going to set him up like this?" and Berry responded "[y]es. You like to file lawsuits so lets see you get out of this." (*Id.*)  Plaintiff then allegedly asked Sergeant Schiller if he was "going to allow him to do this to me" and Defendant Schiller allegedly responded "yes." (*Id.*)

According to Plaintiff, he was then written a theft ticket "for something [P]laintiff was given lawful which was [seven] pair of brand new underwear that officers went into [P]laintiff's room to get while [P]laintiff was being held in the hole being strip[] searched." (*Id.* at 5, 8.) He goes on to assert that as a result of the theft ticket he "was fired from his prison job as a clerk and given [thirty] days (LOP) loss of privileges." (*Id.* at 8.)  On November 5, 2012 Defendant Cady was the hearing officer for Plaintiff's appeal of the theft misconduct report. (Doc. 20-1 at 13.) Defendant Cady found that there was clear and convincing evidence that prisoner had stolen the underwear. (*Id.*) Plaintiff was ordered to pay $17.10 in restitution and sanctioned with thirty days loss of privileges. (*Id.*)

Defendant Normington swears that Quartermaster Labatzky requested the pat down. (Affidavit of Jeffery Normington, Doc. 19-3 at 3.) Quartermaster Labatzky confirms this by swearing that he asked "yard staff to conduct a pat down search of Plaintiff, Bruce Parker #593090, who was new to working in the Quartermaster." (Affidavit of Thomas Labatzky, Doc. 19-10 ¶ 3.) Normington denies that he squeezed Plaintiff's testicles and penis during the pat down and asserts that his "conduct towards Parker remained professional at all times" and that he always adhered to prison policy and training. (Affidavit of Jeffery Normington, Doc. 19-3 ¶ 4.) Normington's affidavit states that Parker complied with the first search request and that during the

6

pat down Defendant Normington "felt several layers of clothing and asked Parker to show me what he was wearing." (*Id.* ¶ 6.) Normington states that he asked for a second pat down because he was left with a "firm believe that Parker was wearing additional clothing and that something seemed peculiar." (*Id.*)

According to Defendant Normington's affidavit, upon the second pat down request, "Parker became agitated and accused me of touching him [in]appropriately. When I repeated my request, Parker again refused and stated he wanted to see the sergeant." (*Id.* ¶ 7.) Normington claims that he then called Sergeant Schiller and explained to him that during the first search he had felt "what appeared to be additional clothing," but that Plaintiff had refused to submit to any more searches. (*Id.* ¶ 8.) Normington denies having made any retaliatory statements and reasserts that his behavior was professional at all times. (*Id.* ¶ 4.) He also states that "[i]nmate grievances and complaints are a daily occurrence, and I have no knowledge or recollection of any grievance or complaint Parker may have filed." (*Id.* ¶ 13.) Normington asserts that he did not write the disobeying a direct order misconduct report in retaliation but because Plaintiff refused a direct order by not submitting to a pat down. (*Id.*)

### 2. Handling of Plaintiff's Legal Mail

The MDOC's Operating Procedure for Processing of Prisoner Legal Mail and Court Filing Fees requires prisoners to present legal mail *unsealed* to qualify for expedited handling. MDOC OP 05.03.118 CFA (E). Prison staff are then required to *look at* the mail to "verify that the prisoner presenting the materials is the prisoner identified on the disbursement form and is also the party identified in the legal materials." *Id.* For purposes of expedited handling, "Legal mail" is defined

as follows: "Mail clearly identified as being to a court or an attorney, or to a party to a new or pending lawsuit . . . ." *Id.* at (A).

Plaintiff alleges that on October 25, 2012, he "went to do legal mail with [Resident Unit Manager ("RUM")] Cady who not only hindered [P]laintiff from sending [it] out . . . but decided to read it out loud to all the officers in the unit and the inmates that were on base." (Doc. 1 at 7.) He also alleges that on October 29, 2012, he "went to send out legal mail with R[UM] Cady who started reading [it] once again . . . and telling [P]laintiff to shut up . . . . R[UM] Cady ripped [P]laintiff's legal mail up and said he wasn't going to send '[s]hit' out [and] for me get my lawyer to do it." (Doc. 1 at 8.) Plaintiff insists that the mail he brought to Defendant Cady was not sealed. (Doc. 20 at 47.) He states that "the legal mail was going to the Attorney General and Commander of the State Police," (*Id.*), and that he was attempting to file "a criminal charge and a civil suit." (*Id.* at 43.) Plaintiff filed two grievances against Defendant Cady for allegedly refusing to send mail, one on October 25, 2012 and one on October 29, 2012.  (Doc. 1 at 8.)

Defendant Cady denies Plaintiff's allegations and asserts that his "conduct towards Parker has always remained professional and appropriate for the given situation." (Affidavit of Richard Cady, Doc. 19-8 ¶ 4.) Defendant Cady refers to his notes, which "indicate that on October 29, 2012, Parker attempted to use MDOC's expedited legal mail system in the morning." (*Id.* ¶ 6.) According to Cady, the mail was sealed so he "was unable to approve the envelopes for expedited handling." (*Id.* ¶¶ 7-8.) The October 29th Grievance Response form's "Investigation Information" section states, "After speaking with RUM Cady, he and prisoner Parker identify the mail as letters going to the State Police and the Attorney General and that they are complaints. These letters were determined NOT to be legal mail as outlined in policy to use expedited legal mail." (Doc. 20-1 at

1, id 294). The "Summary Section" states, "The grievant was attempting to send out mail using the expedited legal mail process that did not meet the criteria. Per RUM Cady the grievant became argumentative and his form (not mail) was torn in half as it did not meet the criteria." (*Id.*) Cady also states in his affidavit that Plaintiff "always had the ability to send the letters out via first class postage and could have received a postage loan for any non-expedited legal mail." (*Id.* ¶ 9); *see also* MDOC Policy Directive 05.03.118 N. However, if Plaintiff requested a postage loan he may have had to yield to a search of the mail: "A prisoner requesting a postage loan may be required to present the mail unsealed to staff to verify that it qualifies for the loan." MDOC Policy Directive 05.03.118 (L).

### D.   Governing Law and Analysis

All Defendants move for summary judgment, asking the court to "dismiss all claims against them." (Doc. 19 at 24.)  Plaintiff asks that Defendants' Motion for Summary Judgement be denied because a "factual dispute" exists. (Doc. 20 at 34.) A Section 1983 claim must show that an official acting "under color of state law 'deprived [claimant] of rights, privileges or immunities secured by the Constitution or laws of the United States.'" *Barker v. Goodrich*, 649 F.3d 428, 432 (6th Cir. 2011) (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005)).

### 1.   Eighth Amendment Claim

Plaintiff alleges that Defendant Normington violated his Eighth Amendment "right to be free from cruel and unusual punishment by groping Plaintiff's testicles and penis" during a 'pat down.' (Doc. 1 at 12.) Plaintiff also alleges that Defendants Berry and Schiller "violated his Eighth Amendment right to be free from cruel and unusual punishment" by taunting him as he was forced to "continue to bend over while naked." (Doc. 1 at 20; Doc. 20 at 24.) Defendants deny the alleged

conduct and assert that they remained professional at all times. (Doc. 19-3 ¶ 4; Doc. 19-12 ¶ 4; Doc. 19-13 ¶ 7.) Defendants further argue that, even if the conduct did take place, it would not amount to an Eighth Amendment violation because none of the alleged conduct was sufficiently serious. (Doc. 19 at 12.) I suggest that Defendants' conduct, while condemnable if true, does not amount to an Eighth Amendment violation because it was not objectively sufficiently serious and Defendants did not have sufficiently culpable states of mind.

### a. Eighth Amendment Governing Law

The Eighth Amendment "protects prisoners from the "unnecessary and wanton infliction of pain," *Whitley v. Albers*, 475 U.S. 312, 319 (1986). The first step in determining if an officer's conduct violates the Eighth Amendment is to identify the nature of the alleged constitutional violation: "[w]hat is necessary to establish an 'unnecessary and wanton infliction of pain' varies according to the nature of the alleged constitutional violation." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (citing *Whitley*, 475 U.S. at 320). Eighth Amendment claims can arise not only from an official's acts but also from an official's omissions, and the standard applied varies accordingly. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994) ("[T]he Eighth Amendment *places restraints* on prison officials, who may not, for example, use excessive physical force against prisoners. The Amendment also *imposes duties* on these officials, who must [for example] provide humane conditions of confinement." (emphasis added)). Unlike the "deliberate indifference" standard, which applies in failure to attend to medical needs cases, an excessive force inquiry turns on "'whether [the] force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Hudson*, 503 U.S. at 6 (quoting *Whitley*, 475 U.S. at 320-21). Establishing an Eighth Amendment claim of excessive

force requires a showing that (1) "the alleged wrongdoing was objectively 'harmful enough'" that it amounted to a constitutional violation, and (2) "'the officials act[ed] with a sufficiently culpable state of mind.'" *Id.* at 8 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).

The objective prong integrates "contemporary standards of decency," and varying factual contexts into Eighth Amendment analyses. *Id.* at 8-9 (quoting *Whitley*, 475 U.S. at 327). The alleged harm must have been "sufficiently serious." *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir 2011). In the excessive force context, "[w]hen "prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated" regardless of whether a significant injury resulted. *Hudson*, 503 U.S. at 9. However not every "malevolent touch by a prison guard" rises to this level: "*[D]e minimis* uses of physical force" are not prohibited by the Eighth Amendment as long as they are not "'repugnant to the conscience of mankind.'" *Id.* (quoting *Estelle*, 429 U.S. 97, 106 (1976)). Excessive force cases should be decided "based on the nature of the force rather than the extent of the injury." *Wilkins v. Gaddy*, 559 U.S. 34, 34 (2010).

The subjective prong "follows from the principle that 'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.' Violations require a 'sufficiently culpable state of mind.'" *Farmer*, 511 U.S. at 834. In excessive force cases, the claimant must go beyond a showing of deliberate indifference, which courts have compared to recklessness,  and demonstrate "that officials applied force 'maliciously and sadistically for the very purpose of causing harm,'" which is more akin to  purposeful or knowing. *Id.* Factors include (1) the extent of the injury suffered, (2) "the need for the application of force," (3) "the relationship between that need and the amount of force used," (4) "the threat 'reasonably perceived by the responsible officials," and (5) "'any efforts made to temper the severity of a forceful response.'" *See  Hudson*

11

503 U.S. 1, 7 (providing factors "that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation, 'or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.'" (quoting *Whitley*, 475 U.S. at 321)). Indications that force is excessive include incidents of force applied with no "penological purpose," *see, e.g.*, *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981), and punishment that is "grossly disproportionate to the offense, *Hutto v. Finney*, 437 U.S. 678, 685 (1978) (citing *Weems v. United States*, 217 U.S. 349, 367 (1910)). Whether a prison official "had the requisite knowledge . . . is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842.

### b. Analysis of Eighth Amendment Claims

Taking the facts alleged in the light most favorable to nonmoving party, even if Defendant Normington groped Plaintiff's genitalia during a pat down, and even if Defendants Schiller and Berry 'taunted' Plaintiff while forcing him to bend over repeatedly during a strip search, I suggest that this conduct does not amount to an Eighth Amendment violation because the injuries were *de minimis* and the pat down and strip search served legitimate penological purposes and were proportional to the security needs.

To begin with, I suggest that allegations of an officer groping a prisoner's genitalia during a pat down and 'taunting' a prisoner during a strip search should be construed and analyzed as Eighth Amendment excessive force cases. Therefore, Plaintiff must allege facts to show that (1) groping genitalia during a pat down and 'taunting' prisoner during strip search is "objectively 'harmful enough' that it amount[s] to a constitutional violation, and (2) Defendants "act[ed] with a sufficiently culpable state of mind.'" *Hudson*, 503 U.S. at 8 (quoting *Wilson*, 501 U.S. at 298.

For the objective component, Plaintiff argues that the force used was sufficiently serious because it was a sexual assault. (Doc. 20 at 25.) I suggest that even if the alleged conduct occurred, it was a *de minimis* use of force and was not "repugnant to the conscience of mankind," *Hudson*, 503 U.S. at 8-9, therefore the conduct was not prohibited by the Eighth Amendment.

The conduct was *de minimis* because Plaintiff did not state any facts to show he suffered any physical or mental pain or damage. While, "'there can be no doubt that severe or repetitive sexual abuse of an inmate . . . can be objectively, sufficiently serious,'" when "[n]o single incident . . . described was severe enough to be 'objectively, sufficiently serious" the conduct does not rise to the level of an Eighth Amendment violation. *Jackson v. Madery*, 158 F. App'x 656, 662 (6th Cir. 2005) (quoting *Boddie v. Schneider*, 105 F.3d 857, 860-61 (2d Cir. 1997)). The alleged conduct in question in *Madery* was the groping of genitalia and verbal harassment of a prisoner during a pat down. *Id.* at 661-62. In this case, the alleged groping and 'taunting' were also *de minimis* because they were single incidents and were not sufficiently severe.

The conduct also was not 'repugnant to the conscience of mankind.' In the case of groping, "[a]ny manual search of an individual's body will require some amount of manipulation of the genitals in order to accomplish the purpose of the search." *Tuttle v. Carroll Cnty. Det. Ctr.*, 3:10-12-DCR, 2010 WL 2228347 1(E.D. Ky. June 2, 2010) *aff'd*, 500 F. App'x 480 (6th Cir. 2012). This does not violate the Eighth Amendment "so long as it occurs as part of an otherwise justified search." *Id.* Likewise, the alleged 'taunting' by Defendants Schiller and Berry is not 'repugnant to the conscience of mankind' because "[a]llegations of verbal harassment and verbal abuse by prison officials toward an inmate do not . . . rise to the level of unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Johnson v. Moore*, 7 F. App'x 382, 384 (6th Cir.

13

2001). Further, "[n]o [f]ederal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury . . . ." 42 U.S.C. 1997e(e).

For the subjective component, Plaintiff must show that "the officials act[ed] with a sufficiently culpable state of mind." *Hudson*, 503 U.S. at 8. Plaintiff argues (1) that the force applied served no penological purpose, (Doc. 20 at 25.); (2) that he "complied with all orders that were given, therefore force was unnecessarily used," (*id.*); and (3) that the fact that force was used when it was not necessary is "evidence that [D]efendants were acting 'maliciously and sadistically to cause harm,'" (*id.*) (quoting *Miller v. Leathers*, 913 F.2d 1085, 1088 (4th Cir. 1990)). Because the pat down and the strip search both served a legitimate penological purpose, and  the extent of the injury was proportional to the amount of force needed, I suggest that Plaintiff fails to show that Defendants had sufficiently culpable states of mind to meet the subjective component of his Eighth Amendment claim.

Plaintiff disputes Quartermaster Labatzky's statement that he asked a yard staff to pat down Plaintiff. (Doc 20 ¶ 33; Affidavit of Thomas Labtzky, Doc. 19-10 ¶ 3.) However, Quartermaster Labatzky has since retired, (Doc. 19-10 ¶ 2), so he has no interest in perjuring himself.  More importantly, because Defendant Normington was following orders as part of his correction officer responsibilities to maintain discipline and security, the pat down served a legitimate penological purpose. *See Bell v. Wolfish*, 441 U.S. 520, 547 (1979) ("[P]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."). Likewise, the strip search served a legitimate penological purpose because suspicion

14

of Plaintiff needed to be dispelled and Plaintiff had refused to submit to additional pat downs by Defendant Normington.

Additionally, the extent of the injury was proportionate to the amount of force needed to dispel suspicion. Because, as discussed above this force was *de minimis* and served a legitimate penological purpose it was proportionate to the security need.

For the above reasons I suggest that Plaintiff has failed to allege sufficient facts to create a genuine issue as to whether Defendants violated his Eighth Amendment rights.

**2.    Access to Courts Claim**

Plaintiff alleges that Defendant Cady denied him access to court when he "decided to tear [P]laintiff's legal mail up and read it out loud to the entire base and then refuse to send it out." (Doc. 1 at 14.) Defendant Cady denies that he ever destroyed legal mail and asserts that he remained professional around Plaintiff at all times. (Affidavit of Richard Cady, Doc. 19-8 ¶¶ 4-5.) These differing accounts may appear, at first blush, to create an issue of fact.  However, because Plaintiff fails to show prejudice to an actual meritorious claim, I suggest that he has failed to allege facts sufficient to show that Defendant deprived him of access to courts.

**a. Governing Law for Access to Courts Claims**

It is well-established that prisoners have a constitutional right of "adequate, effective, and meaningful" access to the courts. *Bounds v. Smith*, 430 U.S. 817, 822 (1977); *Procunier v. Martinez*, 416 U.S. 396, 419 (1974) ("The constitutional guarantee of due process of law has as a corollary the requirement that prisoners be afforded access to the courts in order to challenge unlawful convictions and to seek redress for violations of their constitutional rights."). In *Lewis v. Casey*, the Supreme Court held that in order to bring a § 1983 action based upon a violation of

15

the prisoner's right of access to the courts, the prisoner must show that he was prejudiced by demonstrating a specific actual injury. 518 U.S. 343, 351 (1996). After *Lewis*, the Sixth Circuit explained,

> [i]n order to state a claim for denial of meaningful access to the courts . . . plaintiffs must plead and prove prejudice stemming from the asserted violation. Plaintiffs must demonstrate, for example, that the inadequacy of the prison law library or the available legal assistance caused such actual injury as the late filing of a court document or the dismissal of an otherwise meritorious claim.

*Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996). An "'underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint . . . .'" *Brown v. Matauszak*, 415 F. App'x 608, 612 (6th Cir. 2011) (quoting *Christopher v. Harbury*, 536 U.S. 403, 415 (2002)). Further, the actual injury must have occurred in one of three types of cases: "a prisoner's right to access the courts extends to direct appeals, habeas corpus applications, and civil rights claims only." *Thaddeus-X*, 175 F.3d at 391.

### b. Analysis for Access to Court Claim

Plaintiff does not state in his complaint what sort of legal mail Defendant Cady 'tore up.' He therefore did not plead an essential element of an access to court claim. The legal mail that Defendant Cady allegedly tore up, however, appears to relate to an attempt to get the state of Michigan to file a criminal sexual assault complaint and a civil complaint against Defendant Normington. (Doc. 20 at 47) ("The legal mail was going to the Attorney General and Commander of the State Police."). Plaintiff would not be a party to either a civil complaint or a criminal complaint brought on behalf of the State of Michigan. Further, the definition of "Legal mail" does not appear to include letters to the "Attorney General" or the "Commander of the State Police." MDOC OP 05.03.118 CFA (A). Therefore, even if Defendant Cady did destroy Plaintiff's mail,

16

it was not 'Legal mail,' and this conduct did not prejudice an otherwise meritorious claim. Therefore, I suggest that Plaintiff has failed to plead facts sufficient to show that Defendant Cady deprived him of his access to courts.

### 3.    Retaliation Claims[2]

Plaintiff complains that Defendants Normington, Schiller, and Berry retaliated against him by issuing misconduct reports.(Doc.1 at 13-14.) Defense argues that Plaintiff has failed to show that (1) any adverse actions taken by Defendants "would deter a person of ordinary firmness from continuing to engage in" the constitutionally protected conduct, and (2) any adverse actions taken by Defendants were motivated at least in part by Plaintiff's protected conduct. *Thaddeus-X*, 175 F.3d at 395. For the reasons laid out below, I suggest that Plaintiff has failed to meet his burden of production on these two requisite elements of a retaliation claim.

### a. Governing Law for Retaliation Claims

A First Amendment retaliation claim consists of the following elements: (1) the plaintiff was engaged in constitutionally-protected conduct; (2) the defendant's adverse action would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) a causal connection between elements one and two, i.e., "the adverse action was motivated at least in part by the plaintiff's protected conduct." *Id.*

For the first element, a plaintiff must show engagement in protected conduct. Filing non-frivolous grievances and lawsuits is a constitutionally-protected activity. *Siggers-El v. Barlow*, 412

---

[2] In the Motion for Summary Judgment, Defendant Cady does not address the retaliation claim. However, Defendant Cady argues that he is entitled to qualified immunity. (Doc. 19 at 28.) Because, after raising the defense of qualified immunity, a Defendant is entitled to qualified immunity if Plaintiff fails to show that "a constitutional violation has occurred," *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005), I will analyze whether Plaintiff has met his burden of production to establish that Cady violated his First Amendment right to be free from retaliation in the qualified immunity analysis section below. *See infra* Part D.4.c.

F.3d 693, 699 (6th Cir. 2005) (citing *Thaddeaus-X*, 175 F.3d at 391). This follows from the well-established principle that "prisoners have a constitutional right of access to courts." *Id.*

For the second element, in order to be cognizable, a retaliation claim must also meet the "sensible standard," that is, a plaintiff must show how an "official's acts 'would chill or silence a 'person of ordinary firmness' from future First Amendment activities.'" *Thaddeus-X*, 175 F.3d at 397 (quoting *Crawford-El v. Britton*, 93 F.3d 813, 826 (D.C. Cir. 1996)). Even though harassing an inmate for exercising their First Amendment right is never justifiable, "'[i]t would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise . . . .'" *Id.* at 397 (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982))**.** The Sixth Circuit has found that a sanction of "[fourteen] days of lost privileges" does not constitute an "'adverse action' that would deter a person of ordinary firmness from engaging in the protected activity of filing grievances." *Ingram v. Jewell*, 94 Fed. App'x 271, 273 (6th Cir. 2004).

The third element–a causal connection between the protected conduct and the adverse action–is evaluated with a burden-shifting technique. *Thaddeus-X*, 175 F.3d at 399. The burden initially falls on the plaintiff, who must show that the protected conduct motivated the harm. *Id.* Then the burden of production shifts to the defense, who must show that the same action would have been taken even if the plaintiff had not engaged the protected conduct. *Id.*

*Thaddeus-X* also articulates the standard for summary judgment in retaliation claims:

"The standard for summary judgment put forth in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986), requires the movant to show "that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." Circumstantial evidence, like the timing of events or the disparate treatment of similarly situated individuals, is appropriate. The plaintiffs in this case have done more than simply

18

allege retaliation: in their verified complaint and in an additional affidavit, they have put forward a number of specific, nonconclusory allegations and identified affirmative evidence that could support a jury verdict at trial.

*Id.*

### b. Analysis of Retaliating Through Pat-Down and Issuance of Misconduct Reports

Defendant does not dispute that Plaintiff was engaged in constitutionally protected conduct so there is no need to address the first element of a retaliation claim. For the second element, Defendants argue that Plaintiff has not shown that Defendants' conduct, if true, would "deter a person of ordinary firmness from continuing to engage in that conduct." (Doc. 19 at 22) (quoting *Thaddeus-X*, 175 F.3d at 399). They point to the fact that Plaintiff was only charged with Class II misconduct, which carries no extension of "inmate's prison term by loss of good time or disciplinary credits if found guilty." (*Id.*) Plaintiff argues that because the misconduct reports could result in extra institutional points, which are used to determine "security classification level" and chances of "parole," the misconduct reports could indirectly result in a longer prison stay. (*See* Doc. 20 at 17.) Even if this were an accurate representation of policy, however, the resulting institutional points would have to be aggregated with Plaintiff's other misconduct. Plaintiff would always be in control of his chances of parole and his security classification, simply by not engaging in any other misconduct. Therefore, the possible aggregation of these misconduct reports into future parole and security classification decisions is too attenuated to deter a person of ordinary firmness. Likewise, because the Sixth Circuit has found that fourteen days loss of privileges would not be enough of a deterrence, *Ingram*, 94 Fed. App'x at 273, Plaintiff's thirty day loss of privilege was not enough of a deterrence either. I suggest therefore, that Plaintiff has

19

not shown that a person of ordinary firmness would be deterred by Defendants' issuance of the misconduct reports for theft and disobeying a direct order.

I suggest that Plaintiff has also failed to establish a causal relationship between Plaintiff's constitutionally protected conduct of filing a federal complaint and Defendants allegedly adverse actions of issuing misconduct reports. Defendants have met their burden of production because Plaintiff was found guilty of theft and disobeying a direct order. In *Brown v. Caruso*, this district agreed with other courts' findings that defense "can satisfy its burden . . . by proving the misconduct charge was resolved against the Plaintiff." 07-11804, 2008 WL 553273 (E.D. Mich. Feb 29, 2008); *see also Jackson* 158 Fed. App'x at 664 (quoting *Henderson v. Baird*, 29 F.3d 464, 469 (8th Cir. 1994) ("'A finding of guilt based upon some evidence of a violation of prison rules essentially checkmates [a] retaliation claim.'")).

I likewise suggest that Plaintiff fails to show that Defendant Normington retaliated against him for conducting the pat down because he has failed to establish the second and third elements of a retaliation claim. Defendant Normington does not dispute that Plaintiff was engaged in constitutionally protected conduct. However, Plaintiff does not allege how a pat down would deter a person of ordinary firmness from engaging in the protected conduct of filing a federal complaint. Prisoners are often subjected to pat downs as a part of their confinement. Also, as discussed above, the quartermaster ordered the pat down; so Defendant Normington would have conducted the pat down even if Plaintiff had not been pursuing his constitutionally protected conduct. Therefore, Plaintiff fails to establish the second and third elements of a retaliation claim against Defendant Normington for conducting the pat down.

### 4.      Qualified Immunity Defense

Defendants also move for summary judgment claiming they are shielded from any liability by qualified immunity since none of the Plaintiff's "clearly established" constitutional rights were violated. (Doc. 19 at 21-24.) Plaintiff asks the Court to deny the motion because he has alleged enough facts to show that his Defendants violated his clearly established Eighth, First, and Fourteenth Amendment constitutional rights. (Doc. 20 at 30-33.) The Court must determine whether Defendant's conduct has violated any of Plaintiff's clearly established constitutional rights. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Because Plaintiff has failed to allege facts that show that the Defendants' conduct rises to the level of violating any of his clearly established constitutional rights, I suggest all Defendants are entitled to qualified immunity.

#### a. Governing Law for Qualified Immunity Defenses

The defense of qualified immunity "can be raised at various stages of the litigation including at the pleading stage in a motion to dismiss, after discovery in a motion for summary judgment, or as an affirmative defense at trial." *English v. Dyke*, 23 F.3d 1086, 1089 (6th Cir. 1994) (citing *Kennedy v. City of Cleveland*, 797 F.2d 297, 299-300 (6th Cir. 1986)). The defense of qualified immunity generally shields government officials acting within their discretion from liability for civil damages as long as their conduct does not violate "clearly established constitutional rights" of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Once the defense of qualified immunity is raised, the burden falls on the plaintiff to show that the defendant is not entitled to qualified immunity. *Curry v. School Dist. of the City of Saginaw*, 452 F. Supp. 2d 723, 734 (E.D. Mich. 2006) (citing *Silberstein v. City of*

21

*Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)). When a defendant moves for summary judgment on the basis of qualified immunity, the analysis involves three inquiries.[3]

> (I) "whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred"; (ii) "whether the violation involved a clearly established constitutional right of which a reasonable person would have known"; and (iii) "whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights."

*Radvansky v City of Olmsted*, 395 F.3d 291, 302 (6th Cir. 2005) (quoting *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)). Courts are no longer required to address these inquiries sequentially; instead a court may use its sound discretion to determine which of the prongs of the qualified immunity analysis should be considered first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The Supreme Court has clarified the interplay between qualified immunity and the summary judgment standards found in Rule 56(c) of the Federal Rules of Civil Procedure:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should

---

[3] In *Saucier v. Katz*, the Supreme Court identified only two of these prongs. 533 U.S. 194, 201 (2001). The second prong, however, integrated the "objective legal reasonableness of an official's conduct, as measured by reference to clearly established law." In *Dickerson v. McClellan*, the Sixth Circuit made the "objectively unreasonable" requirement a distinct third prong.

not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Scott v. Harris*, 550 U.S. 372, 380 (2007) (citations omitted).

### b. Qualified Immunity Analysis for Defendants Normington, Schiller, and Berry

I suggest that Defendants Normington, Schiller, and Berry are entitled to qualified immunity because even when the alleged facts are viewed in light most favorable to Plaintiff, they do not show that his clearly established constitutional rights were violated. Plaintiff's First and Eighth Amendment claims are 'clearly established,' so Plaintiff meets this prong of qualified immunity analysis. However, because none of the alleged Defendants' conduct rises to the level of constitutional violations, Plaintiff has failed to plead sufficient facts to show that Defendants have violated any of his clearly established constitutional rights.

Even if Plaintiff was able to show that Defendants Normington, Schiller, and Berry did violate Plaintiff's rights, however, I suggest that Plaintiff also fails to show the third prong of qualified immunity: that Defendants actions were objectively unreasonable in light of Plaintiff's clearly established rights. *See Radvansky*, 395 F.3d at 302. Defendants were acting reasonably because they were working within procedures that served legitimate penological purpose of maintaining order and security within the prison.

### c. Qualified Immunity Analysis for Defendant Cady

I suggest that Defendant Cady is entitled to qualified immunity because even when the alleged facts are viewed in a light most favorable to Plaintiff, they do not show that his clearly established First Amendment right to be free from retaliation was violated. To begin with, Plaintiff's meets the "clearly established" prong of qualified immunity analysis because it was well-established long before the conduct at issue in this case took place, that officers may not

retaliate against individuals for exercising First Amendment rights. *Estate of Dietrich v. Burrows*, 167 F.3d 1107, 1013 (6th Cir. 1999) (citing *Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 283-84 (1977). However, because Plaintiff fails to make out his retaliation claim, he fails to meet the second prong of qualified immunity analysis–that his clearly established right was violated. Nor does he show the third prong of qualified immunity, that, even if Defendant Cady did rip up his mail and violate the conflict of interest policy it was objectively unreasonable in light of Plaintiff's clearly established right to be free from retaliation.

First, Plaintiff fails to meet the second and third elements of his retaliation claim against Defendant Cady for violating MDOC conflict of interest policy. (Doc. 20-1 at 13.) On November 5, 2012, Defendant Cady was the hearing officer for Plaintiff's appeal of the theft misconduct report. (Doc. 20-1 at 13.) Plaintiff claims that Defendant violated an MDOC conflict of interest policy by not removing himself from the appeal hearing and he violated this policy in order to retaliate against Plaintiff for filing a grievance against him. *Id.* Plaintiff meets the first element of a retaliation claim because filing a grievance would be considered constitutionally-protected conduct. *Siggers-El*, 412 F.3d at 699 (finding filing grievances to be constitutionally-protected conduct). However, just as Plaintiff fails to show how the underlying adverse action of the misconduct reports would deter a person of ordinary firmness from pursuing grievances, he fails to show how Cady's participating in the hearing, which could have resulted in a guilty finding, would be enough of a deterrence. The result would be the same in this case–a guilty finding. However, it would not result in a longer sentence, and loss of privileges is *de minimis*. *See Ingram*, 94 Fed. App'x at 273. Plaintiff also fails to meet the third element of his retaliation claim because he does not show a "causal connection between the protected conduct and the adverse action."

24

*Thaddeus-X*, 175 F.3d at 399. Showing that a genuine issue of fact exists requires more than alleging that retaliation occurred. *Id.* (citing *Anderson*, 477 U.S. at 256). Plaintiff has failed to provide evidence showing that Defendant Cady refused to remove himself from the theft misconduct hearing in retaliation for Plaintiff filing a grievance against him. Further, circumstantial evidence actually works against a causal connection in this case, unlike in *Thaddeus-X*, because so much time had passed–the misconduct appeal was heard on November 5th, and the grievances were filed on October 25 and October 29.

For Defendant Cady's alleged conduct on October 25, 2012, Plaintiff fails to show all three elements of a retaliation claim.  This is because only the grievance filed against Cady qualifies as constitutionally protected conduct, and Plaintiff did not file the grievance until after the incident. In his response, "Plaintiff asserts that Defendant Cady retaliated against him because he read plaintiff's legal mail and didn't agree with the contents . . . which was the beginning stages of a criminal and civil suit against . . . Normington. Further [D]efendant retaliat[ed] against [P]laintiff for grievances he's filed against him personally." (Doc. 20 at 16.) I suggest that, since Plaintiff would not have been a party to either the criminal or civil suit, only the grievance was constitutionally protected conduct. *Siggers-El*, 412 F.3d at 699 (finding filing grievances to be constitutionally protected conduct).

Plaintiff fails to make out the second and third element of his retaliation claim for both the October 25 and October 29 incidents. He fails to show the second element, that Defendant Cady's tearing up legal mail "would deter a person of ordinary firmness from continuing to engage in" pursuing an MDOC grievance against Cady, because Plaintiff had other means to send his mail. (Affidavit of Richard Cady, Doc. 19-8 ¶ 9.) Therefore, it would take a person very little resolve

25

to continue to pursue a grievance–a grievant need only use the other available method for sending mail. Additionally, since Plaintiff would not have been party to either the potential civil or criminal complaint, any harm done in allegedly blocking his mailings would be *de minimis*.

I suggest that Plaintiff also fails to show the third element of a retaliation claim against Defendant Cady for the conduct on October 25 and October 29 because MDOC policy would have required him to refuse to send Plaintiff's mail even if Plaintiff were not engaged in a grievance process against Cady. Defendant would have had to refuse to send Plaintiff's mail, first, because policy requires the mail to be sealed. Even if it the envelopes were unsealed as Plaintiff claims, however, it is a perfectly reasonable, and I suggest accurate, interpretation of the 'Legal mail' definition to exclude mailings to the Attorney General and Commander of the State Police from that category. Therefore Defendant Cady had no discretion in refusing to expedite Plaintiff's mail because it was not 'Legal mail.' Plaintiff may argue that the policy did not require that Defendant Cady rip up his disbursement authorization form, or his actual mail for that matter. However, the result would be the same either way–Defendant would not have been able to expedite the mail. To the extent that Plaintiff argues that he had to redo all of his legal research, (Doc 20 at 43), a person of ordinary resolve could have mitigated that damage by making copies of his or her work before bringing it to Defendant Cady, or by mailing it through regular first class mail.

Alternatively, Plaintiff fails to substantiate his allegations that Defendant Cady tore up his legal mail, not just his form, and therefore fails to establish a genuine issue of material fact. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Plaintiff alleges that Defendant Cady read his mail in a room full of correction officers and inmates. (Doc. 1 at 7.) Plaintiff has shown that he knows how to gather affidavits from inmates, *see* (Affidavit of Ellis #423653, Doc. 20 at 81), so it follows that

he could have asked one of the inmates that were present on one of the two days that he attempted to send out his mail to attest to the fact that Cady was acting unreasonably, but he failed to do so.

Because Plaintiff fails to establish that Defendant Cady retaliated against him, Plaintiff likewise fails to show the second prong of qualified immunity, that Defendant Cady actually violated his 'clearly established' right to be free from retaliation.

Even if Plaintiff was able to establish the second prong of qualified immunity, however, I suggest that Plaintiff also fails to show the third prong of qualified immunity, that Defendant Cady's actions were objectively unreasonable in light of Plaintiff's clearly established right to be free from retaliation. *See Radavsky*, 395 F.3d at 302.

### E.    Conclusion

For the reasons laid out above, I suggest that Defendants' Motion for Summary Judgment be **GRANTED**.

### III.    <u>REVIEW</u>

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the

objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.


Date:  June 26, 2014                            /S PATRICIA T. MORRIS
                                                Patricia T. Morris
                                                United States Magistrate Judge


## CERTIFICATION

I hereby certify that this Report and Recommendation was electronically filed this date using the Court's CM/ECF system which delivers a copy to all counsel of record.  A hard copy was delivered by first class mail to Bruce Parker, #593090, Muskegon Correctional Facility, 2400 S. Sheridan, Muskegon, MI, 49442.

Date:  June 26, 2014                    By     s/*Jean L. Broucek*
                                        Case Manager to Magistrate Judge Morris